TEXAS INDEMNITY INS. CO. v. SPRINGFIELD.

No. 3830.

Court of Civil Appeals of Texas. Beaumont.
March 20, 1941.

Rehearing Denied April 2, 1941.

Forse & Forsé, of Newton, Fountain, Cox & Sandlin, of Houston, and Adams & Hillin, of Jasper, for appellant.

Collins, Williams & Garrison, of Lufkin, and E. A. Lindsey, of Newton, for appellee.

WALKER, Chief Justice.

This is a compensation case, with appellant, Texas Indemnity Insurance Company, the compensation insurance carrier; Kirby Lumber Corporation, the employer; Bruce Springfield, deceased, the employee; and appellee, J. H. Springfield, the father of the deceased, the compensation claimant. After overruling appellant's motion for an instructed verdict and its motion for judgment non obstante veredicto, the court entered judgment on the verdict of the jury in favor of appellee against appellant in the lump sum of $4,802.54, with interest at six percent per annum from September 2,

1940, from which appellant has prosecuted its appeal to this court.

Appellant contends that the sole cause of the death of Bruce Springfield was acute hemorrhagic nephritis, of which his employment was in no sense a producing cause, and that the court erred in refusing to instruct a verdict in its favor, and in refusing, after the jury had returned its verdict, to enter judgment in its favor non obstante veredicto.

Bruce Springfield died Monday morning, May 1, 1939, while in the course of his employment with the Kirby Lumber Corporation. At the time of his death he was 18 years old, had been in perfect health all of his life; he had not complained of any illness, ache or pain; he had shown no outward sign within his body of any disease or infection; he weighed from 165 to 170 pounds; while in high school he played football, basketball and baseball, and was "quite a foot racer"; he played ball the day before his death. There was testimony that he had never complained of any physical pain or illness of any kind; on the day he died he ate breakfast at his home; nothing out of the ordinary was observed in his conduct or physical condition; on that morning he went to work with his father in his father's car; before beginning work he walked about a quarter of a mile; he ate nothing after breakfast.

Bill Martin testified that he was about ten feet from Bruce when he fell; he was not looking exactly at him, a pair of plyers attracted his attention. He had talked to Bruce on the morning he died; he had known Bruce well all his life; Bruce was a fine specimen of manhood and apparently in fine physical condition; he talked with Bruce about 8 o'clock before he died; talked with him just before his death and "did not observe any difference in him from what he had always observed"; Bruce was jolly and laughing; he did not say anything about any pain.

Appellee, the father of the deceased, testified that the deceased spent some time in the C.M.T.C.; he was in training in that camp, something in the way of military training for three summers; he knew that Bruce had to take a physical examination each time before the camp would accept him; Dr. Worthy at Call examined Bruce on Friday before he died on Monday.

Dr. W. R. Worthy testified that he had been for many years a doctor for Kirby Lumber Corporation; he had no suspicion that Bruce was suffering from pain; he examined him shortly before he died:

"I examined him three or four times to go off to the Military camp; those examinations are very casual; there is nothing required very positive about it. The State pays me nothing to make it. I am not paid anything at all. I had a few months previous told his father that I had examined him and that he was one of the best specimens of young manhood I had seen anywhere. When I examined him for employment with Kirby Lumber Company I made a thorough examination. I didn't make a clinical analysis of the urine or what I might call a microscopic examination at that time. I did make a physical examination when he went to work. I had found him to be and stated to his father he was one of the best specimens of physical manhood I had seen in a long time. If this boy had been suffering with nephritis—hemorrhagic nephritis—to such an extent that he would fall dead within a few months you would probably have detected it, and would probably not have detected it. If I had taken a urinalysis, I would have if he had nephritis at that time, detected it. I think it would have been discovered at that time. Some of the symptoms of this hemorrhagic nephritis are, well, they generally put on a bloat, if it is not very acute, why, they will show a soggy appearance and show they are not eliminating the proper amount. I found nothing like that in Bruce. * * *

"Q. But from your examination, in your post-mortem operation, you would not tell the jury now, would you, doctor, what this boy died from? A. I would not. The post-mortem examination—until we had a pathologist's report I wouldn't say what he died from. That Dr. Wier handled the post-mortem operation and that he turned the kidneys over to the pathologist and the pathologist did the examination."

J. B. Smith testified that prior to the death of Bruce Springfield he had been an employee of Kirby Lumber Corporation for twelve years; he knew Bruce Springfield during Bruce's life; Bruce was fully six feet tall; he appeared to be in good physical condition; had never heard him complain of any ailment or pain while he was on the job; on the morning he died, Bruce was tying lumber to be exported and to be used in making flooring; he was tying behind a machine; the machine was 15 or 16 feet wide; a table was where the lumber came out; the grader was there and he sorted the timber; there were three or four workbenches; they had sawhorses and stacked the lumber; the lumber came out at different lengths; they stack it up until they get a roll and then the tier moves the bench that is full to the end of the bench, and ties it up and loads it on the buggy; they tie the bundles up with wires, larger wire than bailing wire, and they trim the ends of the wire; Bruce usually stood at the end of the benches, pulling the lumber out to the end; he was back and forth, approximately six or eight feet:

"I saw Bruce the morning he died; I saw him fall. He was standing right at the end of the bench, down close to this end, and I was coming along through, walking; I had been over to the water fountain; I was coming back eastward when I saw Bruce. Bruce was talking to Robert Ogden and Bill Martin; it was about nine o'clock. Well, he was standing up and talking to these boys. I went and got my drink and he was standing up facing the boys and they was close together; so, I walked through and I touched one of them and got him to step back so I could pass through. When they stepped back I started to pass right between them, and Bruce just—Bruce stepped back on his leg that way, or something; he had his back to these benches, and I didn't notice anything particular; he kind of give down in one leg, then he kind of caught on the other one, and kind of give down and fell back. He struck his head on the table as he fell back, and I reached down to try to help him out; * * * he struck his head on one of those horses,— he struck his head on the end of these pieces and fell in in between the legs,— he hit his head on that. This is a four by four that comes through the top. It is just like a sawhorse. He hit his head on the top board. That board I would say was about an eight by an inch and a half gum board. Just prior to the time he fell, he, I think, stepped backward; you know, when I started to get through he kind of stepped back to give me room to go between. It is kind of crowded in there at times and they was standing up talking. So, I started to pass through and I touched Bill—I wouldn't be positive, but I believe it was Bill Martin, whichever one was on that side, and

asked them to let me by, and naturally, they both stepped back, Bill and the other two boys stepped back for me to go between them; and that left Bruce something like that far from me when he fell. I saw him fall. He just fell when his legs give way; he kind of give down in the knees and fell back like that, and across the back of his head, why, he struck that cross piece on the table, and he struck it hard enough and loud enough I could hear the sound of the bump above the noise of the planer. That is pretty hard, I would say. Those planers make a good deal of noise. They were running at that time. After he fell I just stopped when he fell and reached down to help him up. I didn't think he was probably hurt back, you know; I wasn't expecting it; and when I caught his hand, he didn't feel to have any life about him or try to get up. I pulled on him; he wouldn't try to get up, and Jesse Rodrequez come helped me get him from under the table. We kind of worked him around; he kind of gasped a little bit, and one of the boys went and got some water. We put it on his face; he didn't appear like he was dead; some of them said 'you ought to carry him to the Doctor,' and three or four of us packed him up and carried him to Jesse's car and went to the doctor's office. When we started to lift him he was laying on his face when he fell under the table; his legs were kind of up there; he fell back with on hand—I disremember which hand, but one of his hands was up on his breast like; I just reached down and caught him by the hand and pulled on him. He didn't try to help himself, and Jesse run around and we got him by both hands and lifted him from under the table, that is, the cross-piece, and laid him down on the floor with his head to the east; that was with his face toward the door, where I come from the water fountain. We put the water on him, and then picked him up like that and carried him out to the car, facing that direction. His head was back under the horse. When he struck his head on the table he fell on through, you know, his head and back give way and he went through under the table on his back. When we put the water on him, I put my hand on him and lifted up his head. We raised his head up that way. I believe I was holding his head up when Jesse put the water in his face; just poured it in his hand and put it on his face. I raised him up like that and I got a little

blood on my shirt sleeve. There was a little broken place in the skin the blood came from here, just a small place in the back of his head. The wires cut in tying the bundles had a tendency to roll under one's feet, if he happened to step on a pile of them; they would probably slip around like gravel or something, mash them or something. Sometimes you stick one in your shoe sole, or something like that. They are not bad to roll; they are not bad about it. * * * While the doctor was making the examination, I told him he struck his head on the table as he fell. The doctor worked around his neck."

In performing the post-mortem, the doctors did not cut the skin down on the neck, nor did they examine the vertebrae of the neck; they did not make an X-ray of the base of the skull.

Appellant's attorneys admitted that appellee's doctor, A. E. Sweatland, was a qualified physician. Dr. Sweatland testified that he had taught anatomy in the University of Arkansas for ten years; that he had been practicing in Texas since 1912, and had done special work in surgery and in brain work; "A person can have concussion of the brain without any hemorrhage of the brain"; a post-mortem operation might not disclose that concussion; a microscopic examination of the brain might not disclose a concussion sufficient to produce death; a person's neck may be broken to such an extent as to produce death, and it may be that the fracture or break can not be located by palpation:

"Palpation is pressure—gentle pressure with your hands, fingers; any part that you wish to find out, get some information as regards to the condition. You can not by feeling of the neck always locate a fracture or broken vertebra which would be sufficient to produce death in a man eighteen years old weighing 170 pounds. Such a fracture can be located and definitely determined by X-ray. In my opinion, if a man weighing 170 pounds would fall backward, striking a board some six or eight or twelve inches above the floor with such force to have the noise from the striking of his head or neck on the board heard above the running sawmill machinery from a distance of three or four feet would in my opinion be a sufficient blow to break his neck. The symptoms of a broken neck depend on how much of the cord and medulla are involved. You can have a

broken neck—I have had several of them that lived ten days after the neck was broken. Assuming that the striking of the head or neck upon such board was sufficient to produce death, still it would depend on where the neck was broken, what bones were involved and whether the medulla was involved in order to say just what the symptoms would be. Even if the top of the head was removed, the brain taken out, and the cavity cleaned, and one looked in it by artificial lights you might or might not see the vertebrae of the neck with sufficient clarity to determine whether or not there is a fracture; it would depend on how much displacement there was of the fragments of the vertebrae that were fractured. Some of the symptoms of hemorrhagic nephritis—you can have hemorrhage from the kidneys from a stone passing; you can have hemorrhage from a blow; you can have considerable blood in the urine coming from a severe blow. Hemorrhagic nephritis means hemorrhage of the kidneys, that is the plain definition and nephritis means inflammation of the kidneys. Supposing acute hemorrhagic nephritis is Bright's disease, Bright's disease does not produce hemorrhage as a rule. Bright's disease, unless it is acute inflammation of the kidneys, is rather a long continued affair. A man eighteen years of age at the inception of Bright's disease, we would expect him, a good healthy young man, to be more likely to throw it off or resist it than an elderly person. There are two divisions of Bright's disease. There is the acute form; he can have a lot of bloating and swelling and albumen in the urine; and all of that. And then there is the chronic form of Bright's disease that creeps on and is very often overlooked in older people. In a case of acute Bright's disease we would expect bloating to be one of the symptoms, if it was acute. It would be the most unlikely thing in the world from a practical standpoint that a young man, eighteen years of age, weighing 170 pounds, who had been examined many times and immediately before his death spent Sunday afternoon playing ball, or a great part of it, goes to bed, makes no complaint, eats a good breakfast the next morning, goes to work about eight or a little after eight, turns around and faces some others and there is no apparent change in his features, color, or anything and then he falls, that such a man died with Bright's disease that way. I explain that by saying, 'Well, for the very reason Bright's disease even in the acute form, doesn't kill'. If this young man we have been talking about when he fell never regained consciousness, never spoke, and never moved, and died within ten minutes or sooner I would say that acute Bright's disease did not kill him. If a man such as already described falls backward striking his head on a sawhorse some eight or twelve inches above the floor with such force that the bump is heard some four or five feet away over the noise of the running sawmill I would say that such a blow would be sufficient to break the man's neck."

Answering the questions, could a young man this size live to the time he fell dead, doing his average work, nobody observing any change in him whatsoever; and would he live up to the time with Bright's disease, nobody observing any change, and fall dead, the doctor said: "Not from Bright's disease. He could not from any kidney ailment that I know anything about. A young man, as you have described, falling striking the board on the sawhorse as you have described, falling perfectly limp, after which he doesn't respond in any way and the back of his head was injured enough so that the party putting his arm under the head got blood on his sleeve I would say could have had a severe enough concussion to kill him, and could have had an injury to the medulla. His neck could have been broken by a fall like that. If the lick is sufficient to produce death then one of the symptoms would be paralysis. We would expect a person suffering from acute Bright's disease to be bloated some days before death comes. I know of no such case where there was no bloating. There is always bloating in Bright's disease that would produce death. In acute nephritis the patient begins after a time to show pallor, the blood isn't what it should be and that shows in the skin. I would think the bloating would be sufficient that intimate friends who were closely associated with him would notice it, if it had gone that far—if it had gone far enough to kill him. I do not think that he could go on without being bloated to such an extent that somebody would notice it. Usually there are some headaches in those cases, not always continuous. I wouldn't expect a man before he came to death from acute Bright's disease to get out and play ball fourteen hours before his death. It is

doubtful that he could do it; I would say he could not. He could not, with acute Bright's disease, two hours before death tie up bundles of lumber, doing his regular work as efficiently as ever. I mean it is my opinion it would be impossible for a young man of this kind to go right up until he fell dead without some symptoms that would be noticeable to his people."

On the testimony as summarized, the court did not err in overruling appellant's motion for an instructed verdict and in refusing to enter judgment non obstante veredicto; this conclusion does not require the citation of authorities in its support.

As against the jury's verdict, it would serve no useful purpose to make a statement of appellant's evidence.

■ The evidence raised the issue that the injury received by Bruce Springfield was "accidental", and was sufficient to establish a causal connection between his injury and his death.

■ Answering special issues, the jury found that Bruce Springfield "fell in the Kirby Lumber Corporation's planing mill on May 1, 1939"; that in falling he struck his head against a wooden sawhorse; that he "sustained an injury to his head as the result of falling against a wooden sawhorse"; that the injury to his head, sustained by Bruce Springfield as a result of falling against a wooden sawhorse on May 1, 1939, "* * * was a producing cause of his death"; and that, as the result of falling against a wooden sawhorse, Bruce Springfield sustained an injury to his neck, which injury was a producing cause of his death. As against these findings, the court did not err in refusing to submit an issue "as to whether Bruce Springfield sustained an accidental injury which produced his death"; that issue was sufficiently covered by the court's charge.

■ Appellant complains that because appellee "failed to plead facts to show 'good cause' for failure to file his claim for compensation at a date earlier than February 16, 1940, the court was without jurisdiction"; and also that the evidence did not raise the issue of "good cause"; and that "the court erred in failing and refusing to inquire of the jury by proper issues whether plaintiff had good cause for failure to file his claim during all of the time up to the date of filing." These contentions are overruled. As good cause, appellee plead that within six months after the death of his son, Dr. Worthy told him that his son did not die of injury but from disease; soon thereafter and as soon as he was physically fit he had to go to South Carolina for cancer treatment, where he was compelled to remain until the lapsing of six months; after returning from South Carolina he learned that his son had fallen and had sustained injuries; as soon thereafter as his physical condition permitted, he went to see and employed attorneys to represent him in filing his claim for compensation; immediately upon learning that he had not been correctly advised of the cause of his son's death and as soon as he was able to leave his room, he employed attorneys and filed his claim before the Industrial Accident Board. These facts constituted a sufficient allegation of "good cause" for the delay in filing his claim. Appellee's testimony raised the issues of fact plead by him as constituting good cause. Without quoting from the court's charge, we hold that the issue of "good cause" was satisfactorily submitted.

In our conclusions on the issue of "good cause" we pretermit a discussion of appellee's counter propositions that appellant's answer was not sufficient to support its assignments on that issue; that its assignments are not sufficient to raise the point of want of "good cause"; and that the assignments against the court's charge are insufficient to support the failure to submit that issue.

It follows that the judgment of the lower court should be affirmed, and it is accordingly so ordered.

Affirmed.